IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Rebecca Chatham, ) | |
| ) | Civil Action No. 8:04-1857-HFF-BHH |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| State Farm Mutual Automobile ) | |
| Insurance Company and Terence ) | |
| Hassan, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the court on the defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In her complaint, the plaintiff alleges that her employment was terminated because of her pregnancy in violation of Title VII of the Civil Rights Act of 1964, as amended. She also alleges state court causes of action for outrage and wrongful termination in violation of public policy.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

In August 1998, the plaintiff was placed by a temporary employment agency at a State Farm Insurance agency in Anderson, South Carolina. At the time of her placement, the insurance agency was operated by an agent named Angie Howard (pl. dep. 11-13, ex. 3). Howard left the agency, and State Farm changed the Anderson agency to an Emergency Servicing Program ("ESP") (pl. dep. 17, ex. 3). The plaintiff testified that

State Farm bought out her contract with the employment agency and made her an employee of State Farm. While the Anderson agency was operated as an ESP, the plaintiff was supervised by Bob Joiner, State Farm's Agency Field Executive. The plaintiff faxed her time sheets to Joiner's assistant at State Farm's Agency Field Office ("AFO"), where they were approved by Joiner and paid by State Farm (pl. dep. 18-20, ex. 1).

Individuals must work as a trainee agent for one year prior to becoming an independent contractor agent with State Farm.  According to Joiner, State Farm independent contractor agents control the manner and means of work for the employees in their agencies.  They buy or lease their own offices, buy office furniture, equipment, and supplies, and they hire, fire, supervise, and determine the pay, benefits, working hours, and other terms and conditions of their employees' employment (Joiner decl. ¶¶ 4-5).  Joiner testified in his sworn declaration that State Farm trainee agents are similar to independent contractor agents in that the control their agency and employees.  However, State Farm reimburses trainee agents for certain agency expenditures, such as an office, furniture, equipment, and supplies, up to a certain amount.  State Farm also reimburses trainee agents for certain staff employees (Joiner decl. ¶¶ 7, 9).

The Anderson agency was run as an ESP for approximately one year until Chris Gaddy became the trainee agent in 1999. The plaintiff testified that while Gaddy was a trainee agent, nothing about her employment changed.  She was not required to fill out an employment application, her wages and benefits remained the same, and Gaddy was required to go by State Farm polices as directed from the AFO.  The plaintiff was paid by Gaddy while he was a trainee agent, but he was reimbursed by State Farm.  After Gaddy became an agent, he was no longer reimbursed for salaries by State Farm.  Gaddy also changed the hours of the agency and began giving employees vacation after he became an agent.  The plaintiff went to Gaddy with any problems and approached Joiner only if

there was a problem she could not resolve with Gaddy (pl. dep. 24-28). Gaddy left in 2000, and the agency reverted to an ESP office (pl. dep. 31).

David Crist became the trainee agent for the Anderson office during late 2000 or early 2001. On February 28, 2002, the plaintiff completed an employment application entitled "State Farm Insurance Companies, Field Employment Application" (pl. dep. 32, 39-40, ex. 3). When Crist became an agent, State Farm required the plaintiff to formally resign her employment from the "Anderson ESP 40-1298," which she did on July 9, 2002 (pl. dep. 34-35, ex. 2). According to the resignation letter, the plaintiff resigned "in anticipation of employment by Trainee Agent Dave Crist" (pl. dep., ex. 2). After Crist became an agent, he "ran the show" (pl. dep. 38). The plaintiff testified that once a trainee agent became an agent, she considered herself to be the agent's employee (pl. dep. 35-36).

Crist left the Anderson agency effective September 1, 2003. Defendant Terence Hassan was identified as the agent who would take over the agency. However, before taking over the agency, he needed to finish training (Hassan decl. ¶ 3). According to the plaintiff, Joiner met with the employees and told them that the agency would be run as a Temporary Agency Service Program ("TASP") and that agent Terence Roberts was going to run the agency on a temporary basis. The employees were also told that their positions, benefits, and pay would not change (pl. dep. 45-46). On August 5, 2003, the plaintiff was required to complete an employment application that was entitled "State Farm Insurance Companies, Field Employment Application" (pl. dep. 52, ex. 4). During the time that Roberts was at the agency, the plaintiff's payroll check came from him, he conducted staff meetings, and he was the person the employees went to with leave issues. Joiner also attended meetings and occasionally ran the meetings. When the plaintiff approached Roberts about taking vacation, he told her that she was not entitled to any at that time. The plaintiff complained to Joiner who, according to the plaintiff, made the decision to give the plaintiff a couple of days of vacation until Hassan assumed control of the agency (pl. dep.

47-49, 52). Roberts testified in his declaration that he alone decided to give the plaintiff the extra vacation time after the issue was brought up by Joiner (Roberts decl. ¶¶ 8-10). Roberts testified that the decision to allow the plaintiff additional vacation was completely his and that while he operated the TASP agency he had complete control of the agency and employees (Roberts decl. ¶¶ 5, 10). While Roberts was at the agency, the plaintiff's insurance policy stayed the same, but Roberts required that the employees pay a portion of the premiums, which they had not done under Crist (pl. dep. 53-55, ex. 5). On August 11, 2003, Joiner signed a Transfer of Employee Licenses form approving Roberts' request that the plaintiff's licenses be transferred to his office "since she is now employed by [Roberts]" (pl. dep. 55, ex. 6). On September 1, 2003, the plaintiff signed an Agent's Licensed Staff Agreement that stated that she was not to be considered an employee of State Farm and that Roberts was solely responsible for her conduct and compensation (pl. dep., ex. 7).

In August 2003, while he was training to become an agent, Hassan hired Lynn Lee as a staff employee for his agency. Lee had worked with Hassan at his former business (Hassan decl. ¶ 4). In November 2003, Hassan hired Sylvia Reed for a similar position. Reed was recommended by Joiner (Hassan decl. ¶ 5). Joiner told the plaintiff that Reed was being brought in to make sure the office was not short staffed and to fill the plaintiff's job while she was out on maternity leave. The plaintiff trained Reed to do her job (pl. dep. 125). Hassan also hired Rhett Rutland, who had been an employee of Crist (Hassan decl. ¶ 6).

The plaintiff testified that she became pregnant in the summer of 2003, and thereafter she met with Joiner, Roberts, and Hassan to tell them her plans for maternity leave. The plaintiff told them that she wanted to take 12 weeks of leave, and she was told there would be no problem with that. She was also told that there would be no problem if

she wanted to come back sooner – she would just need to keep them informed (pl. dep. 67-68).

The plaintiff testified that she telephoned Joiner on January 7, 2004, after seeing her physician. She told Joiner that she needed to start her maternity leave because her baby was breech, and she was going to have a scheduled C-section. Joiner told the plaintiff to start her leave if that was what she needed to do. The plaintiff testified that she called Joiner because she thought she had to let him know because "he was the one that was conducting the meetings." Thereafter, the plaintiff telephoned Roberts, but she could not reach him. She went to her office and sent Roberts an e-mail letting him know that she was starting her maternity leave. The plaintiff finished her work day and began her maternity leave on January 8, 2004 (pl. dep. 68-70). Around January 15, 2004, the plaintiff picked up her paycheck from Roberts. Her child was born on January 17, 2004 (pl. dep. 71). After the birth of her baby, the plaintiff went into the office "several times" during her maternity leave to check her e-mail and to speak with her co-workers. She also saw Hassan on several occasions when she went to the office (pl. dep. 71-72). At some point during her maternity leave, the plaintiff completed an employment application for Hassan (pl. dep. 84). On that application, she listed Crist as her former employer and Roberts as her current employer (def. m.s.j., ex. E).

Upon completion of his training and certification, Hassan became a State Farm trainee agent and took over the Anderson agency on February 1, 2004 (Hassan decl. ¶ 6). On Friday, February 20, 2004, the plaintiff stopped by the office. She introduced her children to Hassan and visited with the staff. As she left, the plaintiff told Hassan that she was planning on returning from maternity leave during the first or second week of March. Hassan told the plaintiff that there were some things going on and that he would telephone her on Monday when he knew more (pl. dep. 72-73). After she left, the plaintiff spoke with her husband, and he advised the plaintiff to call Hassan to see if he would talk to her rather than making her wait until Monday. The plaintiff called Hassan, and he told her that State

5

Farm was going to reimburse him for only two staff people and that he was trying to work it out so that he could "keep [her] on." He stated that he had contacted other agents to see if they had positions open and he was trying to "work things out." The plaintiff asked if this meant she did not have a position to return to, and Hassan replied, "Yes" (pl. dep. 74-75). The plaintiff called her husband, who told her to meet him at the agency office. According to the plaintiff, her husband was "pretty upset" and was "disagreeing" with Hassan when she arrived. As she walked in, the plaintiff's husband told Hassan to tell her why he was letting her go. Hassan again told the plaintiff that State Farm was going to reimburse him for only two staff persons. The plaintiff asked why he chose other employees over her when she had more seniority, experience, and a license. Hassan stated that his decision to let her go "was made easier because I know you would like to stay at home with your children." The plaintiff asked whether she was a problem employee or made too much money. The plaintiff testified that she told Hassan she wanted a reason she could understand. Hassan responded that he had given her "the only reason [she was] going to get" (pl. dep. 75-78).

The plaintiff called Jim Acker, who was at that time the AFO, and requested to meet with him, which she did. The plaintiff told him what had happened, and Acker stated that he would get back with her. A couple of days later, Acker informed the plaintiff that her position with Roberts ended on January 31, 2004. Hassan took over the agency on February 1, 2004, and thus she was never an employee of Hassan (pl. dep. 82-83).

### **APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

6

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that

7

> there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

The plaintiff alleges a cause of action for pregnancy discrimination in violation of Title VII. The defendants argue that the plaintiff's claim fails because she was not employed by, nor had she sought employment with, an employer as defined by Title VII. Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." 42 U.S.C. §2000e(b).

The defendants argue that State Farm's agents are independent contractors and that employees of State Farm's trainee agents and agents are not employees of State Farm. The defendants contend that the plaintiff was an employee of Roberts when she went on maternity leave, and she applied to become an employee of Hassan after he took control of the office while she was on leave. Thus, the defendants argue that the plaintiff's claim is that Hassan failed to hire her upon her return from maternity leave. However, as neither Roberts nor Hassan employed 15 employees, they do not fall within the purview of Title VII, and the plaintiff's claim fails.

The determination of whether a person is an employee or an independent contractor depends on the definition of employee from the common law of agency. *Fairlow v. Wachovia Bank of North Carolina, N.A.*, 259 F.3d 309, 313 (4th Cir. 2001).

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) (citations and footnotes omitted). Resolution of these factors is a question of law. *Fairlow*, 259 F.3d at 313.

The defendants argue that in all cases dealing with State Farm, the courts and the Equal Employment Opportunity Commission ("EEOC") have unanimously ruled that State Farm's agents are independent contractors (def. m.s.j. 8, ex. G). *See, e.g., Craft-Palmer v. State Farm Ins. Co.*, 1:97-CV-345RG (S.D. Miss. Nov. 17, 1997), *aff'd* 157 F.3d 903 (5th Cir. 1998); *Hasty v. State Farm Mutual Auto. Ins. Co.*, No. 4:98-CV-1723FRB (E.D. Mo. Nov. 4, 1999); *Myers v. State Farm Mutual Auto. Ins. Co.*, No. 4:97CV1274CDB (E.D. Mo. June 30, 1998). Further, the defendants argue that courts have held by extension that employees of State Farm Insurance agents are not employees of State Farm but rather employees of the agent (def. m.s.j. 8). *See e.g., Deal v. State Farm County Mutual Ins. Co. of Texas*, 5 F.3d 117, 119 (5th Cir. 1993) (holding that employees of State Farm agents are employees of the agent and not State Farm and therefore neither the agent nor their employees have standing to assert discrimination claims against State Farm).

In support of their argument that the plaintiff was not an employee of State Farm, the defendants note that the plaintiff considered herself an employee of the agent for whom she worked (pl. dep. 36). The plaintiff conceded in her deposition that agents

had the right to change benefits and office policies, including leave, that applied to her and other staff employees (pl. dep. 32-33, 36, 41, 48-50, 53-56, ex. 5; def. m.s.j., ex. D). Whenever control of the agency changed to a new agent, the plaintiff completed an employment application and had to be hired by the new agent (pl. dep. 34-35, 52, ex. 2, 4, 5). The plaintiff also had to transfer the sponsorship of her insurance licenses to the new agent (pl. dep. 34-35, 57, ex. 6). The plaintiff stated in her deposition that she was paid directly by Crist and Roberts and that they offered her different benefit options and had different leave policies (pl. dep. 32-33, 36, 41, 48-50, 53-56, ex. 5; def. m.s.j., ex. D). Joiner testified in his declaration that State Farm agents buy or lease their own offices; purchase their own office furniture and office equipment; buy their own supplies; and hire, fire, supervise, and determine the terms and conditions of their staff's employment, including pay and working hours (Joinder decl. ¶ 5).

While the plaintiff was working with a trainee agent, she considered herself to be the employee of the trainee agent, the AFO, and State Farm (pl. dep. 35-36). The plaintiff believed this because Joiner still participated in and helped conduct staff meetings and, while her salary was paid by the trainee agent, State Farm reimbursed the trainee agent for that expense. According to the testimony of Joiner and Hassan, trainee agents, like Hassan, controlled the manner and means of the agency as follows:

> 1)  Hassan hired and fired his own staff, determined their rate of pay, benefits, and other terms and conditions of their employment, and paid them through his own business account;
>
> 2)  Hassan was paid a specified monthly payment based on the region/zone policy at the time of his appointment;

3)     Hassan could receive compensation above his specified monthly payment if his gross receipts from State Farm exceeded his overhead, and his agency made a profit;

> 4)  Hassan determined his own working hours, whether he took vacation and the duration of his vacation, and how he went about the day-to-day activities of his insurance sales business;

>    5)   Hassan and his staff were free to solicit whomever they wished for insurance business, as long as he stayed within the bounds of his license and did not "raid" existing policy holders of other State Farm insurance agents;
>
>    6)   State Farm reimbursed Hassan for two employees; however, he could hire more staff members, but he would have to personally pay for additional staff.

(Joiner decl. ¶¶5, 7-11; Hassan decl. ¶¶ 4-6, 8, 11).

Applying the factors discussed above to this case, it is clear that on the day she left for maternity leave, the plaintiff was employed by independent contractor agent Roberts and not State Farm. While the agency was a TASP, Roberts controlled the operating hours, hired Crist's former employees, including the plaintiff, and controlled the conditions, terms, and benefits of their employment. *See Deal*, 5 F.3d at 119. The plaintiff even considered herself an employee of Roberts. Upon the expiration of Roberts' term as the TASP agent, the Anderson location was taken over by Hassan, a trainee agent, who, like an agent, was responsible for hiring his own employees and setting the terms and conditions of their employment, which he did. Individuals who desired to be hired by Hassan had to apply for a position, which the plaintiff did in February 2004. Like agents, Hassan hired and fired his own staff, determined their rate of pay, benefits, and other terms and conditions of their employment, and paid them through his own business account.

The plaintiff argues that State Farm had the ability to interfere with the employment relationship between her and the agents for whom she worked. She cites as an example that when Roberts refused to grant her vacation, Joiner "overrode his decision" (pl. resp. m.s.j. 11). The defendants dispute this and maintain that Roberts made the decision to give the plaintiff the extra vacation time. However, even assuming that Joiner did make the decision, the evidence is insufficient to establish that the plaintiff is State Farm's employee when the totality of the working relationship is considered.

11

In support of her claim that State Farm was her employer, the plaintiff also notes that (1) she spoke with both Joiner and Roberts about her maternity leave, (2) she informed them both when she was to begin her leave, (3) she complained to the new AFE regarding Hassan's decision not to hire her, and (4) Joiner spoke to employees of the agency regarding issues when it changed agents.  As noted by the defendants, these examples show the plaintiff's desire to keep Joiner, or the other AFE, informed.  However, there is no evidence that she was required to inform Joiner of her maternity leave, and the defendants maintain that Joiner's involvement during the changeover to Hassan was to assist with the transition of the agency from Roberts to Hassan.  Further, when the plaintiff complained to the new AFE about Hassan's decision, Acker informed her that her position with Roberts ended on January 31, 2004, and thus she had never been hired by Hassan (pl. dep. 83-84).

As argued by the defendants in their reply brief, the plaintiff's citations to cases in which liability under Title VII was applied to both temporary agencies and the employers who used the services of the agencies' employees are easily distinguishable (def. reply 5).  In those cases, the temporary agency "typically" provided compensation and benefits to the employee, while the unrelated employer provided direction (pl. resp. m.s.j. 9).  In this case, as in the cases cited above, State Farm's agents and trainee agents controlled the plaintiff's compensation, benefits, and schedule, as well as gave her direction on a day-to-day basis.  *See Konieczny v. Derickson and State Ins. Co.*, No. 86-5083, 1987 WL 56671 (S.D. Ill. 1987) (holding that State Farm could not be held liable under an agency theory for pregnancy discrimination by one of its agents and that the two defendants should not be considered as one employer because the agent was responsible for all employment related decisions, policies, and practices).  *See also Deal*, 5 F.3d at 119 (holding that State Farm agent was not an agent of State Farm for purposes of Title VII because the agent was solely and independently responsible for employment related decisions).

As the plaintiff was neither employed by, nor had she sought employment with, an employer as defined by Title VII, summary judgment should be granted on her pregnancy discrimination claim.

The plaintiff has also alleged causes of action for outrage, or intentional infliction of emotional distress, and violation of the public policy of the State of South Carolina. As it is recommended that the plaintiff's discrimination claim fails, the court should decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims. *See* 28 U.S.C. §1367(c).

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted.

s/Bruce H. Hendricks
United States Magistrate Judge

April 14, 2005

Greenville, South Carolina